# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

AZANIAH BLANKUMSEE, #326-398          *

Plaintiff          *

v.          *          Civil Action No. PWG-16-2801

MARYLAND DEPARTMENT OF PUBLIC          *
  SAFETY AND CORRECTIONAL
  SERVICES, *DPSCS,*          *
COMMISSIONER OF CORRECTION,
RICHARD GRAHAM, *Warden of WCI,*          *
DENISE GELSINGER, *Ass't Warden of*
  *WCI,*          *
LOIBEL, *Correctional Officer,*
WEXFORD HEALTH SOURCES, INC.,          *
JANICE GILMORE, *Medical Regional*
  *Administrator at WCI,*          *
ROBUSTIANO BARRERA, *Medical*
  *Administrator at WCI,*          *
A. CARTWRIGHT, *ARP Coordinator*
  *at WCI,*          *
RYAN BROWNING, *Registered Nurse*
 *at WCI,*          *
JANE DOE, *Nurse at WCI,*[1]
                            *

Defendants

                           ***

## MEMORANDUM OPINION

Pending before the Court is Azaniah Blankumsee's Verified Complaint, filed pursuant to 42 U.S.C. § 1983, which alleges that Defendants violated his rights under the First and Eighth Amendments to the Constitution of the United States. ECF No. 1. Blankumsee claims that Defendants denied him adequate medical care, interfered with his right of access to courts, and

---

[1] Service was not obtained on Jane Doe. Blankumsee's eleventh hour effort to substitute Tara Cotrell for Defendant Jane Doe (Supp., ECF No. 26) is opposed by the Medical Defendants (Browning, Gilmore, Barrera, Wexford Health Sources, Inc.), Med. Defs.' Reply, ECF No. 28. For reasons discussed in the section Claims Against Medical Defendants, I will deny Blankumsee's request.

unlawfully retaliated against him.  *Id.*  Defendants, the Maryland Department of Public Safety and Correctional Services ("DPSCS"), Commissioner of Correction Dayena Corcoran,[2] Warden Richard J. Graham, Jr., Assistant Warden Denise Gelsinger, Correctional Officer II Christopher Loibel, and Correctional Officer II Alicia A. Cartwright (collectively, the "State Defendants"), filed a Motion to Dismiss or, in the Alternative for Summary Judgment, supported by a Memorandum.  ECF Nos. 11, 11-1.  Defendants Ryan Browning, LPN, Janice Gilmore, Robustiano Barrera, M.D. and Wexford Health Sources, Inc. (collectively, the "Medical Defendants") filed a separate Motion to Dismiss, or in the Alternative, Motion for Summary Judgment, supported by a Memorandum.  ECF Nos. 21, 21-3.[3]  The Clerk sent notice to Blankumsee, who is self-represented, informing him of his right to respond to Defendants' dispositive motions and to file affidavits and exhibits in support of his claims.  ECF Nos. 16, 24. Blankumsee filed Responses (ECF Nos. 20, 27) opposing Defendants' Motions.  The Medical Defendants filed a Reply. ECF No. 28.[4]

No hearing is necessary.  Loc. R. 105.6 (D. Md. 2016).  After considering the Verified Complaint, exhibits, and applicable law, I will grant both dispositive motions.

---

[2]  The State Defendants indicate Dayena M. Corcoran is the Commissioner of the Division of Correction.  State Defs.' Mem. 11 n.1.  Additionally, "Robustiano Berrera" should be spelled "Robustiano Barrera."  The Clerk will correct the docket to reflect the full names and titles of all Defendants as shown in their respective memorandum opinions, ECF Nos. 11-1, 21-3.

[3] The Medical Defendants' Motion to Seal, ECF No. 22, in which they ask to seal Blankumsee's medical records (filed as Exhibit 1 to their Motion for Summary Judgment, ECF No. 23), IS GRANTED, given that the records contain Blankumsee's personal information and cannot be presented in redacted form.  But, insofar as Blankumsee put his medical conditions at issue and neither party sought to seal the briefings, I will not seal or redact this Memorandum Opinion, which discusses Blankumsee's medical records.

[4]  I denied Blankumsee's Motion to Recuse (ECF No. 30) for reasons stated in my Order dated July 13, 2017.  ECF No. 33.

# BACKGROUND

## Plaintiff's Allegations

Blankumsee is an inmate in the custody of the Maryland Division of Correction and presently incarcerated at the Maryland Correctional Institution in Hagerstown. The allegations in Blankumsee's Complaint arise from incidents that occurred during the time he was housed at the Western Correctional Institution ("WCI") in Cumberland, Maryland.

Blankumsee filed an administrative remedy procedure ("ARP") request, ARP-WCI-623-16, on March 21, 2016, complaining that the medication Dr. Robustiano Barrera prescribed for him was "being altered and interfered with" by registered nurses assigned to administer medication. Compl. 3, ¶ 17; ARP-WCI-623-16, ECF No. 1-2. [5] He alleges that, to retaliate against him for filing ARP-WCI-623-16, Defendants fabricated a story a few weeks later, on April 14, 2016, falsely claiming that he was hoarding prescription medication. As a result, his pain medication was stopped, "causing him unnecessary suffering and pain for 84 days." [6] *Id.* at 5, ¶ 27. In he

According to Blankumsee, the truth about the April 14, 2016 incident is that, after he left the medication line and took his medication, he was searched by "Officer Elliott," [7] who did not find any contraband on him. Compl. 3. Blankumsee was then approached by Officer Loibel,

---

[5] In another ARP, Blankumsee complained that on March 23, 2016, his medication was crushed and floated in water. ARP Index 5, ECF No. 11-4. In prison settings, medication is crushed for ingestion when there is concern of hoarding. Crushing the medication does not affect its efficacy, but renders it more difficult to hoard and/or distribute. Barrera Aff. ¶¶ 7-8, ECF No. 21-5.

[6] The medical record shows that Blankumsee was seen by medical providers for complaints on April 22, 2016, September 14, 2016, and September 27, 2016, October 19, 2016, November 27, 2017, and December 7, 2017. ECF Nos. 11-6, 23.

[7] In his declaration, Defendant Loibel identifies the officer who searched Blankumsee as Officer Elyard. Loibel Decl. ¶ 2, ECF No. 11-2.

who had found an empty medication cup on the grass. When Loibel asked Blankumsee whether the cup was his, Blankumsee responded, "No, after I took my medicine I threw my cup in the trash." Compl. 3. Blankumsee then returned to his cell. That evening, Blankumsee learned that his pain medication was discontinued for hoarding. *Id.*[8]

On April 17, 2016, Blankumsee filed ARP WCI-913-16, challenging the cessation of his pain medications for hoarding. ARP WCI-913-16, at 1, ECF No. 1-4. In it, Blankumsee denied hoarding medication. *Id.* On April 21, 2016, Angela Cartwright, the institutional ARP Coordinator, procedurally dismissed the ARP because Blankumsee had exceeded the limit of requests approved by the Commissioner. *Id.*[9]

On May 3, 2016, Blankumsee filed ARP WCI-997-16. ARP WCI-997-16, at 1, ECF No. 11-5. In it, again referring to the incident on April 14, 2016, Blankumsee asserted that Loibel was "unprofessional[]" and, against prison policy, left his post; as a result, he was unable to see Blankumsee take his medications. *Id.* Blankumsee asserted that he had taken his medication and discarded the cup and was not found with any medication on him. *Id.* After investigation and reports by Lieutenant L.C. Bennett (ARP WCI-997-16, at 7-8) and Ryan Browning (*id.* at 4-5), Acting Warden Denise Gelsinger denied the ARP on May 23, 2016, stating:

> Your request for administrative remedy is dismissed. On 4-14-16 you were observed by the medication nurse leaving the medication window without taking your medication. Nursing staff notified custody staff of this. The yard officer was notified and instructed to complete a pat search on you. While walking towards the officer you were observed dropping something on the ground. It was discovered that you had dropped a cup containing crushed medication on the ground. No other medication was found on you at this time. Nursing staff was notified of these events. Nursing staff then contacted the onsite provider and were given instruction to discontinue your Ultram and Neurontin due to hoarding. This was completed and instructed by the doctor. You continue to be monitored

---

[8] Blankumsee was not issued a prison rule infraction for hoarding medication. Compl. 3.

[9] Blankumsee filed 56 ARP requests at WCI between August 10, 2015 and October 15, 2016. ARP Index 2-7.

through the sick call process.

*Id.* at 3, 4-5.  He appealed on June 7, 2016.  *Id.* at 11-13.  His appeal was dismissed on June 20, 2016 for failure to provide additional evidence in support of his claim.  *Id.* at 15.

In Count I, Blankumsee claims that Defendants Gelsinger, Loibel, Wexford, Barrera, Gilmore, Browning, and Jane Doe provided him inadequate medical care in violation of his rights under the Eighth Amendment, thus causing him unnecessary pain.  *Id.* at 4, ¶¶ 22-25.  In his opposition, he argues that he was punished for hoarding, and suffered nerve damage that paralyzes his fourth and fifth fingers on both hands because his medication was stopped.  Pl.'s Opp'n 4.

In Count II, Blankumsee claims that all Defendants interfered with and denied him medical treatment for his serious and chronic conditions for 84 days.  Compl. 4, ¶ 27.  In Count III, Blankumsee alleges that Gelsinger and Cartwright violated his right to seek redress under the First Amendment by withholding necessary information and "maliciously" dismissing his ARP complaints.  *Id.* at 5 ¶ 30.  He faults Commissioner Corcoran for violating his First Amendment rights by "instigating and personally participating" in the dismissal of his grievances without a hearing.  *Id.* at 5, ¶ 31.  In Count IV, Blankumsee claims that DPSCS, Graham, Gelsinger, Commissioner Corcoran, and Wexford Health Sources, Inc. ("Wexford"), failed to train employees and "respond appropriately."  *Id.* at 5, ¶ 32.

Blankumsee seeks declaratory relief, injunctive relief "to continue [his] medical treatment," $1 million dollars in compensatory damages against each Defendant jointly and severally, and $75,000 in punitive damages against each Defendant.  Compl. 5, ¶¶ 35-37.

*State Defendants*

The State Defendants provide the following version of the April 14, 2016 events, which they support with declarations and verified copies of Blankumsee's prison records. ECF No. 11.[10] On April 14, 2016, Nurse Jami Wratchford was distributing medication to inmates. Wratchford notified Officer Loibel that Blankumsee had left the medication window without taking his medicine. Loibel Decl. ¶ 2, ECF No. 11-2. Loibel followed Blankumsee, who was walking very fast. Loibel radioed Officer Elyard who was ahead of Blankumsee and asked him to stop Blankumsee for a pat search. When Officer Elyard called Blankumsee, Loibel, who was walking behind, observed Blankumsee drop something on the ground so that Elyard would not see it. *Id.* Elyard then proceeded to pat search Blankumsee while Loibel approached them and identified the dropped item, which was a medication cup with crushed pills in it. *Id.* Loibel asked Blankumsee why he threw down the pill cup. Blankumsee denied that the cup was his. Loibel then informed Blankumsee that he needs to take his medications before leaving the medication window because staff is required to watch him ingest the medicine. Loibel informed Nurse Wratchford that he found the pills. Loibel learned from Wratchford that Blankumsee had not taken his medications at the window in the past, but she had been unable get an officer's attention to stop him. *Id.* Loibel states that he has never conspired against Blankumsee or interfered with his medical treatment or receipt of prescribed medication. *Id.* ¶ 3.

Nursing staff contacted Dr. Barrera, who instructed them to discontinue Blankumsee's prescriptions for Ultram, Baclofen, and Neurontin due to hoarding. Barrera Aff. ¶ 5, ECF No. 21-5; Med. Recs. 1-2, ECF No. 23.

---

[10] Although Blankumsee filed a Verified Complaint, he has not filed any declarations to dispute the records Defendants provided.

Private medical contractors provide health care for WCI Inmates. Graham Decl., ECF No. 11-3. Warden Graham does not have, nor has he ever had the authority to influence the medical decisions of the private medical care contractor. *Id.* ¶ 2 Graham states that he is not licensed to practice medicine and defers to the expertise of medical providers concerning inmate health matters. *Id.* When responding to WCI inmates' complaints about the medical care, Warden Graham and his staff rely on the reports, assessments, and judgments of the medical contractor's trained medical staff to prepare any response for his signature. *Id.* ¶ 4. Graham denies interfering with, hindering, or delaying medical treatment or care to Blankumsee. *Id.* ¶ 5.

### *Medical Defendants*

The Medical Defendants filed verified copies of Blankumsee's relevant medical records and Dr. Barrera's affidavit (ECF Nos. 23, 21-5) in support of their motion; that evidence provides the following information. Blankumsee sustained multiple gunshot wounds to his face and legs in 2000 and fractured his left leg and right hand in vehicular accidents in 1999 and 2002. He suffers from arthritis in his right hand. Blankumsee was prescribed Ultram, Baclofen, and Neurontin for his pain. Barrera Aff. ¶ 4.

Dr. Barrera discontinued Blankumsee's Ultram, Baclofen, and Neurontin after he was informed that Blankumsee was caught attempting to hoard the medication. *Id.* ¶ 5; Med. Recs. 1-2. Immediately after the pain medication was stopped, Blankumsee was able to complete his activities of daily living without difficulty or assistance. Barrera Aff. ¶ 6; Med. Recs. 2. Blankumsee later refused several substitute medications for his chronic pain, including Elavil and steroid injections. Barrera Aff. ¶ 6; Med. Recs. 4, 8, 9-10.

Dr. Barrera states that inmate hoarding and distributing prescription medications in prison is a serious offense. The medical director has discretion to stop the medication of an inmate who

is hoarding or attempting to hoard prescription medications. Dr. Barrera explains that in prisons, medication is crushed for ingestion when there is concern of hoarding. Crushing the medication does not affect its efficacy, but renders it more difficult to hoard and/or distribute. Barrera Aff. ¶¶ 7-8.

Dr. Barrera explains that terminating the pain medications was medically appropriate because Blankumsee was hoarding, not ingesting the medication. Hoarding is commonly practiced in prisons as a means of acquiring contraband for the purpose of obtaining other commodities or accommodations from other inmates seeking the medications for their own use. Additionally, hoarding may allow an inmate to store and then ingest a much stronger dosage than medically prescribed, thereby creating a substantial danger to the patient. Barrera Supp. Aff. ¶ 4, ECF No. 28-2. Barrera states that Blankumsee's hoarding "strongly indicate[s] that Plaintiff did not medically need the pain medications." *Id.* Barrera asserts that his decision to discontinue medication was in no manner a decision to retaliate against Blankumsee or punish him. *Id*. ¶ 5.

According to Dr. Barrera, there is no medical support for Blankumsee's allegation that discontinuing the Ultram, Neurontin, and Baclofen caused permanent loss of feeling in the fourth and fifth fingers of his right hand. *Id.* ¶ 7. Further, Blankumsee's apparent hoarding indicated that he had discontinued his pain medication on his own. Barrera notes that Blankumsee previously had claimed to be suffering from carpal tunnel symptoms in both hands while on these medications.[11] *Id.* Thus, the symptoms and conditions that Blankumsee alleges resulted

---

[11] Carpal tunnel syndrome occurs when the median nerve, which runs from the forearm into the palm of the hand, becomes pressed or squeezed at the wrist. Symptoms usually start gradually, with frequent burning, tingling, or itching numbness in the palm of the hand and the fingers, especially the thumb and the index and middle fingers. *See* https://www.ninds.nih.gov/Disorders/Patient-Caregiver-Education/Fact-Sheets/Carpal-Tunnel-Syndrome-FactSheet. On December 7, 2016, Blankumsee was seen in the medical unit for complaints of numbness in his hand and fingers. Med. Recs. 9. Examination revealed both

from discontinuing the Ultram, Neurontin, and Baclofen (unspecified chronic illnesses, arthritis, and unspecified nerve damage with severe pain) existed before his medications were discontinued. Further, Dr. Barrera states there is no medical indication that discontinuing the pain medications had any effect on these conditions. *Id*. ¶ 8.

Dr. Barerra states that Gilmore and Browning were not involved in the decision to discontinue Blankumsee's medication. Barrera Aff. ¶ 9. He opines that, to a reasonable degree of medical probability, the decision to stop Blankunsee's prescription pain medication due to hoarding was medically appropriate and within the applicable standard of care. *Id.* ¶ 10.

Blankumsee continues to be monitored regularly for his medical conditions and can request more immediate medical attention through the sick call process. *Id*. ¶ 11. As noted, although Blankumsee filed a Verified Complaint, he has not filed any declarations under oath in response to this evidence.

## STANDARDS OF REVIEW

### Motion to Dismiss

Federal Rule of Civil Procedure 12(b)(6) provides for "the dismissal of a complaint if it fails to state a claim upon which relief can be granted." *Velencia v. Drezhlo*, No. RDB-12-237, 2012 WL 6562764, at *4 (D. Md. Dec. 13, 2012). This rule's purpose "is to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Id*. (quoting *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006)). In this regard, the Court bears in mind the requirements of Fed. R. Civ. P. 8, Bell *Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), when considering a motion to dismiss pursuant to Rule 12(b)(6). Specifically, a complaint must

---

hands had strong grips, all fingers were mobile. His hands were neither tender or swollen. He was prescribed Elavil and an x-ray was ordered. *Id.*

contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), and must state "a plausible claim for relief," as "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," *Iqbal*, 556 U.S. at 678-79. *See Velencia,* 2012 WL 6562764, at *4 (discussing standard from *Iqbal* and *Twombly*). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The claims against DPSCS, Commissioner Corcoran, Warden Graham, Janice Gilmore, and Wexford Health Sources, Inc., and the claims for monetary damages against Defendants Loibel, Gelsinger, and Cartwright, in their official capacities will be reviewed under this standard.

<u>Motion for Summary Judgment</u>

Summary judgment is proper when the moving party demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations ..., admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c)(1)(A); *see also Baldwin v. City of Greensboro*, 714 F.3d 828, 833 (4th Cir. 2013). If the party seeking summary judgment demonstrates that there is no evidence to support the nonmoving party's case, the burden shifts to the nonmoving party to identify evidence that shows that a genuine dispute exists as to material facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585-87 & n.10 (1986). The existence of only a "scintilla of evidence" is not enough to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52 (1986). Instead, the evidentiary materials submitted must show facts from which the finder of fact reasonably could

find for the party opposing summary judgment. *Id.* The claims against Barrera and Browning, and the claims against Loibel, Cartwright and Gelsinger, and Barrera in their individual capacities will be reviewed under this standard.

## DISCUSSION

*Claims Against DPSCS and the Individual State Defendants in their Official Capacities*

Blankumsee's four counts are brought pursuant to 42 U.S.C. § 1983. Section 1983 provides a remedy for individuals who have been deprived of their constitutional rights under color of state law. *See* 42 U.S.C. § 1983 (2012); *City of Monterey v. Del Monte Dunes*, 526 U.S. 687, 707 (1999)). The statute states:

> Every *person* who, under color of any statute, ordinance, regulation, custom or usage of any State or Territory or the District of Columbia, subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983 (emphasis added). "To state a claim under Section 1983, a plaintiff must allege that: 1) a right secured by the Constitution or laws of the United States was violated and 2) the alleged violation was committed by a *person* acting under the color of state law." *Peters v. City of Mount Rainier*, No. GJH-14-00955, 2016 WL 1239921, at *4 (D. Md. Mar. 24, 2016) (emphasis added) (quoting *Brown v. Bailey*, 2012 WL 2188338, at *5 (D. Md. June 13, 2012)), *aff'd sub nom. Peters v. Caplan*, 672 F. App'x 327 (4th Cir. 2017); *see also West v. Atkins*, 487 U.S. 42, 48 (1988).

The State Defendants assert that "DPSCS is not a person under § 1983" and therefore cannot be sued under the statute, and DPSCS and the individual State Defendants in their official capacities are "immune from suit under the Eleventh Amendment." State Defs.' Mem. 6–7, 12.

> Although the . . .Eleventh Amendment argument would appear to implicate this Court's jurisdiction, *see Calderon v. Ashmus,* 523 U.S. 740, 745 n.2 (1998)

(noting that "the Eleventh Amendment is jurisdictional in the sense that it is a limitation on the federal court's judicial power"), the Court must turn first to the statutory argument that the [DPSCS] is not a "person" within the meaning of § 1983. *Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens,* 529 U.S. 765, 779 (2000) (finding that the question of whether a statute permits a cause of action against states should be addressed before the question of whether the Eleventh Amendment bars the cause of action); *Power v. Summers*, 226 F.3d 815, 818 (7th Cir. 2000) (noting that pursuant to *Vermont Agency of Natural Resources,* the district court should have dismissed claims against state officials in their official capacities on the grounds that they were not persons within the meaning of § 1983 rather than on Eleventh Amendment grounds).

*Lawson v. Green*, No. TDC-16-2946, 2017 WL 3638431, at *4 (D. Md. Aug. 23, 2017)

Notably, "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself." *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989). Thus, the claims against the individual State Defendants in their official capacities are claims against the State. *See id.* And, regardless of relief sought, a state is not "a 'person' within the meaning of 42 U.S.C. § 1983." *Kelly v. Bishop*, No. RDB-16-3668, 2017 WL 2506169, at *4 (D. Md. June 9, 2017) (citing *Will*, 491 U.S. at 64-65 & 70-71). Similarly, state agencies such as DPSCS, *see* Md. Code. Ann., Corr. Servs. § 1-101(f), "are not persons within the meaning of the statute." *Lawson*, 2017 WL 3638431, at *4 (citing *Will,* 491 U.S. at 70); *see also Clark v. Md. Dep't of Pub. Safety & Corr. Servs.,* 316 F. App'x 279, 282 (4th Cir. 2009) ("[T]he Maryland Department of Public Safety and Correctional Services is undoubtedly an arm of the state for purposes of § 1983" and therefore "immune from a suit under § 1983." (citing *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 280–81 (1977))). Consequently, Blankumsee fails to state a claim under § 1983 against the individual State Defendants in their official capacities or DPSCS. *See Will*, 491 U.S. at 64–65 & 70–71; *Lawson*, 2017 WL 3638431, at *4; *Kelly*, 2017 WL 2506169, at *4. All claims against DPSCS and the individual State Defendants in their official

capacities are dismissed.

*Personal Participation*

Liability is imposed under § 1983 on "any person who shall subject, or cause to be subjected, any person . . . to the deprivation of any rights. . . ." 42 U.S.C. § 1983. The statute requires a showing of personal fault, whether based upon the defendant's own conduct or another's conduct in executing the defendant's policies or customs. *See Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 690 (1978); *West v. Atkins*, 815 F.2d 993, 996 (4th Cir. 1987), *rev'd on other grounds*, 487 U.S. 42 (1988) (no allegation of personal involvement relevant to the claimed deprivation); *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977) (in order for an individual defendant to be held liable pursuant to 42 U.S.C. § 1983, it must be "affirmatively shown that the official charged acted personally in the deprivation of the plaintiff's rights") (quoting *Bennett v. Gravelle*, 323 F. Supp. 203, 214 (D. Md. 1971), *aff'd*, 451 F.2d 1011 (4th Cir. 1971)). Moreover, an individual cannot be held liable under 42 U.S.C. § 1983 under a theory of respondeat superior.[12] *See Monell*, 436 U.S. at 690; *Love–Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under § 1983).

In a § 1983 action, liability of supervisory officials "is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (citing *Slakan v. Porter,* 737 F.2d 368, 372 (4th Cir. 1984)). Supervisory liability under § 1983 must be supported with evidence that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff;

---

[12] Respondeat superior is a legal doctrine which holds that in some circumstances an employer is responsible for the actions of employees performed within the course of their employment.

(2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *See Shaw v. Stroud,* 13 F.3d 791, 799 (4th Cir. 1994).

### 1. Graham, Gelsinger, and Cocoran

Beyond the threadbare allegation that "all Defendants" denied him medical treatment in violation of the Eighth Amendment, *see* Compl. ¶ 27, Blankumsee does not allege that Defendant Graham, a supervisory official, was personally involved in the matters presented here. As for Gelsinger and Corcoran's personal participation, it is limited to Gelsinger's dismissal of an ARP and Corcoran's denial of the appeal of that dismissal. ARP WCI-997-16, at 1-2, 3, 15, ECF No. 11-5. Denial of a "grievance does not alone impose liability." *See Atkins v. Md. Div. of Corr.*, No. PWG-14-3312, 2015 WL 5124103, at *6 (D. Md. 2015). Thus, Blankumsee can prevail on his claims against these Defendants only if he has demonstrated supervisor liability. *See Monell*, 436 U.S. at 690.

As for their knowledge of their subordinates' conduct, Blankumsee only pleads the conclusory allegation that he "made aware defendant Graham and the Commissioner of Corrections" of "the denial of medical treatment." *Id.* ¶ 19. But, in his Opposition to the State Defendants' Motion, he argues that Gelsinger and Corcoran admitted that they knew about the discontinuance of his medication. Pl.'s Opp'n to State Defs.' Mot. 3. It is true that, after Blankumsee filed ARP WCI-997-16, complaining about Loibel's "unprofessional[]" conduct and insisting that he had not hoarded his medications but rather the story was fabricated to deny him his medications in retaliation for an earlier ARP, it was Gelsinger who dismissed the ARP and Corcoran who denied the appeal, such that both Defendants ultimately knew of the alleged

wrongdoing.  *See* ARP WCI-997-16, at 1-2, 3, 15, ECF No. 11-5.  Blankumsee has not identified a scintilla of evidence that Graham was aware of the events, however.

More importantly, he has not shown that any of these Defendants were aware that the conduct at issue—discontinuance of his medications—"posed a pervasive and unreasonable risk of constitutional injury."  *See Shaw,* 13 F.3d at 799.  Rather, the reports and medical records at the time Gelsinger dismissed the ARP (May 23, 2016) and Corcoran denied the appeal (June 20, 2016) did not show that the discontinuation of Blankumsee's medications caused any injury.  For example, at a sick visit on April 22, 2016, the nurse observed that Blankumsee did "not appear to be in any distress at th[at] time."  Med. Recs. 2.  A review of the evidence before me establishes that it was not until his September 25, 2016 Sick Call Request that Blankumsee reported that it was "impossible for [him] to work or walk, or eat and write."  ECF No. 27-2.  Then, at a September 27, 2016 sick visit, Blankumsee reported that "he had to quit his job working in the kitchen because certain tools make his fingers lock up."  Med. Recs. 4.  Without showing that these supervisor Defendants "had actual or constructive knowledge that [their] subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff," Blankumsee cannot prove supervisor liability under § 1983.  *See Shaw,* 13 F.3d at 799.  Summary judgment is granted in Defendants' favor on Blankumsee's claims against Corcoran, Graham, Gelsinger in Counts I, II, and III.

   *2.  Count IV*

To the extent Blankumsee claims in Count IV that Corcoran, Graham, Gelsinger, and DPSCS and Wexford failed to train correctional staff and "respond appropriately," *id.* ¶ 33, his nonspecific and conclusory allegation is insufficient to state a claim for supervisory liability.  *See Iqbal*, 556 U.S. at 678-79; *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 690

(1978); *Shaw*, 13 F.3d at 799; *Vinnedge*, 550 F.2d at 928.  Indeed, "[g]enerally, a failure to supervise gives rise to § 1983 liability . . . only in those situations in which there is a history of widespread abuse.  Only then may knowledge be imputed to the supervisory personnel." *Wellington v. Daniels*, 717 F.2d 932, 936 (4th Cir. 1983).  Blankumsee offers neither evidence nor allegations of a history of widespread abuse, and his threadbare allegation that he made Defendants aware of the allegedly wrongful conduct of their subordinates is insufficient to withstand a summary judgment motion.  Accordingly, the entirety of Count IV is dismissed.

### 3. Gilmore and Wexford

The Medical Defendants move for dismissal of the claims against WCI Medical Regional Coordinator Janice Gilmore, who is also named in Counts I, II, and III, noting that Blankumsee does not assert any specific facts against her.  Indeed, Blankumsee's only allegations specific to Gilmore are that she violated his "first amendment right to redress. . . as exhibited by defendant Gilmore in Exhibit[] H" and "Gilmore conspired to deny plaintiff all medical treatment." Compl. ¶ 19.  Exhibit H is a request for information that Blankumsee sent to Gilmore; it includes a handwritten response signed by someone whose signature appears to be "K. Martin RN."  ECF No. 1-8.  The response states that "[n]ames of employees w[ould] not be distributed to [Blankumsee]," and that he should "write to the medical records dept." to obtain "copies of [his] records that include[] documentation by the nursing staff." *Id.*

The Medical Defendants also move for dismissal of the remaining claims against Wexford for failure to state a claim under § 1983.  Gilmore and Wexford, "a private corporation . . . carrying out a governmental function [i.e.,] the delivery of medical care in a prison setting," Med. Defs.' Mem. 6, cannot be liable under § 1983 for actions allegedly committed by Wexford or WCI employees if liability is predicated solely upon a theory of respondeat superior. *See*

*Love–Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004). To the extent Blankumsee seeks to hold Gilmore or Wexford culpable based on supervisory liability, he fails to identify a Wexford policy or procedure that proximately caused a violation of his rights. *See Monell*, 436 U.S at 690; *Shaw,* 13 F.3d at 799. Nor has he shown that Gilmore knew that any subordinate employee was engaged in any conduct likely to cause constitutional injury, or that Gilmore responded inadequately to such conduct and thereby injured Blankumsee. *See Shaw*, 13 F.3d at 799. Accordingly, the remaining claims against Wexford and Gilmore are dismissed.

*Medical Claims under the Eighth Amendment – Counts I and II*

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)). To prevail on an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

> Deliberate indifference is a very high standard – a showing of mere negligence will not meet it. . . . [T]he Constitution is designed to deal with deprivations of rights, not errors in judgments, even though such errors may have unfortunate consequences . . . To lower this threshold would thrust federal courts into the daily practices of local police departments.

*Grayson v. Peed*, 195 F.3d 692, 695-96 (4th Cir. 1999).

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed either to provide it or to ensure that

the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *see also Hudson v. McMillian,* 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care). The subjective component requires "subjective recklessness" in the face of the serious medical condition. *See Farmer,* 511 U.S. at 839-40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce,* 129 F.3d 336, 340 n.2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer,* 511 U.S. at 844). If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *See Farmer,* 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *See Brown v. Harris,* 240 F.3d 383, 390 (4th Cir. 2000). Under this standard, Blankumsee must present evidence sufficient to create a genuine issue of material fact as to whether any Defendant was deliberately indifferent to his medical needs when his medication was withheld.

   *1. State Defendants*

   After carefully examining the exhibits, declarations, and Verified Complaint, I find that even when the evidence is viewed in the light most favorable to Blankumsee, it does not show that Loibel, Cartwright, Gelsinger or any other named State Defendant conspired or acted individually to prevent Blankumsee from receiving care for a serious health need. They did not fail to provide care or to ensure its availability. *See Farmer*, 511 U.S. at 837. Indeed, as correctional staff, Loibel, Cartwright, and Gelsinger did not have the authority to discontinue

Blankumsee's pain medicine; it was Dr. Barrera who ordered its discontinuance. Graham Decl. ¶ 2; Barrera Aff. ¶ 5. As for Cartwright specifically, Blankumsee only alleges that she dismissed his ARP, and "the mere fact that [Cartwright] denied [Blankumsee's] grievance does not alone impose liability." *See Atkins v. Md. Div. of Corr.*, No. PWG-14-3312, 2015 WL 5124103, at *6 (D. Md. 2015). And, although a dispute exists as to whether Blankumsee was hoarding his medications, there is not a scintilla of evidence that the State Defendants reported that Blankumsee was hoarding his medications with the intent to convince the doctor to discontinue them.

Further, it is undisputed that, at least immediately after the discontinuance of his medication, Blankumsee could perform his daily living activities. Blankumsee only identifies evidence that he had difficulty with daily living activities more than five months later. Additionally, it is undisputed that other pain medications were available and ultimately offered to him. Thus, the pain medications that were discontinued simply were not needed at the time of their discontinuation, such that Defendants did not fail to provide needed care. Thus, Blankumsee has not provided any evidence that the State Defendants interfered with or attempted to interfere with the care for a serious medical need of his. *See Farmer,* 511 U.S. at 837; *Miltier v. Beorn*, 896 F.2d 848, 854 (4th Cir. 1990) (an Eighth Amendment claim of deliberate indifference cannot generally be against non-medical personnel, unless they personally denied or deliberately interfered with medical treatment). Consequently, Summary Judgment is granted on Counts I and II against the State Defendants.

2. *Wexford and Gilmore*

Wexford and Gilmore are also named in Counts I and II. As discussed above, these Defendants are entitled to summary judgment on all claims against them, including the Eighth

Amendment claims.

### 3. Browning

Browning is also named in Counts I and II. Blankumsee claims that he named Browning in the March 21, 2016 ARP that allegedly led to the purported retaliation against him on April 14, 2016. Compl. 2, ¶ 17. Blankumsee does not allege, however, that Browning was involved personally in the April 14, 2016 incident. Further, Browning was not involved in the decision to discontinue Blankumsee's prescription medication due to hoarding. Barrera Aff. ¶ 9. Rather, he investigated it after the fact. ARP WCI-977-16, at 4-5. Blankumsee's unsubstantiated and self-serving allegation of conspiracy is insufficient to survive the Medical Defendants' Motion. *See Vinnedge*, 550 F.2d at 928.

### 4. Dr. Barrera

Blankumsee also names Dr. Barrera in Counts I and II. Indeed, it was Dr. Barrera's decision to stop the medications after hearing from medical staff that, according to correctional officers, Blankumsee was attempting to hoard medication. It is undisputed that, at the time Dr. Barrera ordered the discontinuation of the medication, Blankumsee was able to perform his activities of daily living. Barrera Aff. ¶ 6; Med. Recs. 2 (noting that, at a sick visit on April 22, 2016, Blankumsee did "not appear to be in any distress at th[at] time" ). In contrast, five months later, in a September 25, 2016 Sick Call Request, Blankumsee complained that it was "impossible for [him] to work or walk, or eat and write," ECF No. 27-2, and at a September 27, 2016 sick visit, he reported that "he had to quit his job working in the kitchen because certain tools make his fingers lock up." Med. Recs. 4. It also is undisputed that, despite those complaints, he refused substitute medications for his chronic pain, including Elavil,[13] which he

---

[13] Elavil or Amitriptyline is also used to treat depression and may be used for certain pain relief.

declined on September 27, 2016, and steroid injections, which he refused on November 27, 2016. *Id.* at 4, 8.

Notably, "to establish a claim of deliberate indifference to medical need, the need must be both apparent and serious, and the denial of attention must be both deliberate and without legitimate penological objective." *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999). Dr. Barrera asserts that discontinuation of the pain medication was medically appropriate because hoarding medication poses substantial medical risks for the inmate patient as well as for institutional security. Barrera Aff. ¶¶ 7, 8; Reply ¶¶ 5-8. Thus, there was a "legitimate penological objective." *Grayson*, 195 F.3d at 695. Blankumsee disagrees with Dr. Barrera's medical decision to stop his pain medication, but his claim amounts to a disagreement with his physician over the appropriate course of care, which does not establish an Eight Amendment violation absent exceptional circumstances not applicable here. *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016) (citations omitted). Dr. Barrera is entitled to judgment as a matter of law on Count I and II, thereby eliminating these claims in their entirety.

*First Amendment Claims – Count III*

Blankumsee alleges that Defendants violated his First Amendment right of access to the courts by dismissing his ARPs. Compl. ¶¶ 19, 30-31. He also appears to allege that his free speech was chilled by Defendants' purported retaliation against him (in the form of a report that he was hoarding medication) for filing a March 21, 2016 ARP. Blankumsee only names Gilmore, Corcoran and Cartwright in Count III. As discussed above, Gilmore and Corcoran are entitled to summary judgment on all claims against them, and Cartwright cannot be liable for simply dismissing an ARP, the only allegation Blankumsee makes against her, *see Atkins v. Md.*

---

*See* https://medlineplus.gov/druginfo/meds/a682388.html.

*Div. of Corr.*, No. PWG-14-3312, 2015 WL 5124103, at *6 (D. Md. 2015).

In any event, the Fourth Circuit has held that, "[t]o prevail on a claim that he was denied access to the courts, a prisoner must demonstrate that he suffered an actual injury, such as missing a court-imposed deadline or being unable to file a complaint because of the Defendants' actions." *Pronin v. Johnson*, 628 F. App'x 160, 161 (4th Cir. 2015) (citing *Lewis v. Casey,* 518 U.S. 343, 351-52 (1996)); *see Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 686 (4th Cir. 2000) (requiring proof "that the defendant's alleged retaliatory action adversely affected the plaintiff's constitutionally protected speech" for a plaintiff to prevail on a First Amendment § 1983 retaliation claim. "Where there is no impairment of the plaintiff's rights, there is no need for the protection provided by a cause of action for retaliation. Thus, a showing of adversity is essential to any retaliation claim." *ACLU of Md., Inc. v. Wicomico Cty., Md.*, 999 F.2d 780, 785 (4th Cir. 1993). Blankumsee's vague and unsubstantiated allegations are insufficient to support a First Amendment retaliation claim. He fails to allege or demonstrate how the purported retaliation either adversely affected his ability to exercise his speech rights and right to access the courts under the First Amendment. Blankumsee does not allege that he wished to file a judicial action or ARP and was dissuaded as a result of the retaliation. Further, he does not assert that he missed any filing deadlines as a result of Defendants' action. Moreover, he filed numerous ARPs after his medications were discontinued, at a rate similar to his previous ARP filings. *See* ARP Index. And, subsequent to April 14, 2016, Blankumsee filed not only this case, but a second action in this district, *Blankumsee v. Graham, et al.*, No. PWG-16-3636 (D. Md.) (filed October 11, 2016). These filings demonstrate that his speech was not chilled, as Blankumsee continues to be a prolific filer, both in the prison system and this Court. Defendants are entitled to summary judgment on Count III.

*Jane Doe/Tara Cotrell*

Blankumsee's eleventh hour effort to substitute Tara Cotrell for Defendant Jane Doe (Supp., ECF No. 26) is opposed by the Medical Defendants. Med. Defs.' Reply, ECF No. 28. Blankumsee alleges that on May 30, 2016, Cottrell said Blankumsee "would never again receive medical treatment due to hoarding" and that he "could not see a doctor cause a doctor discontinued your meds." Supp. Assuming these statements are true, mere verbal threats do not amount to constitutional violations. *See, e.g.*, *Collins v. Cundy*, 603 F.2d 825, 827 (10th Cir. 1979); *Barney v. Pulsipher*, 143 F.3d 1299, 1310 n.11 (10th Cir. 1998) (stating that mere verbal threats are not actionable under § 1983). The medical record unequivocally shows Blankumsee was provided medical care, including alternate medication and continuing treatment, after his pain medication was stopped due to hoarding. Blankumsee's claim against Cotrell lacks merit and shall be dismissed pursuant to 28 U.S.C. § 1915A (requiring this Court to screen prisoner cases).

## CONCLUSION

For these reasons, I will grant the State Defendants' Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (ECF No. 11) and the Medical Defendants' Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (ECF No. 21). The claim asserted against Cotrell shall be dismissed without requiring service of the Complaint. A separate Order follows.

<u>September 8, 2017</u>          _____/S/_____
Date                         Paul W. Grimm
                                  United States District Judge